**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1151-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

EDARIEL MELENDEZ, a/k/a
RIDDICK,

    Defendant-Appellant.

_____

Submitted April 2, 2025 – Decided July 7, 2025

Before Judges Paganelli and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 08-11-0966.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Andrew R. Burroughs, Designated Counsel, on the briefs).

William A. Daniel, Union County Prosecutor, attorney for respondent (Meredith L. Balo, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant, Edariel Melendez, appeals from the July 28, 2022 trial court order denying his motion for a new trial based on newly discovered evidence. Applying well-established law, we conclude the trial court did not misuse its discretion in denying the motion and affirm.

We are fully familiar with defendant's matter having affirmed the judgment of conviction on direct appeal, State v. Melendez, No. A-3829-10 (App. Div. June 27, 2014); and denying his petition for post-conviction relief (PCR), State v. Melendez, No. A-3940-15 (App. Div. Oct. 19, 2017).

We recite the facts from our opinion on defendant's direct appeal:

> [D]efendant is a member of the Crips gang. On the evening of November 11, 2007, in Elizabeth, another Crip, an individual known by the name of "Twin," was gunned down. Two days later, the first victims in the underlying matter, two thirteen-year-old boys, were struck by bullets, not aimed at them, as they headed home on their bicycles. One youth, E.H., was fatally injured, while the other youth, who was shot three times in the arm, calf, and thigh, survived. A third youth was uninjured. Two days after this shooting, a second shooting occurred. The victim, C.P., responded to his doorbell at 5:30 a.m. When he opened the door, he was fatally wounded. At the time, it was believed the shots were intended for an individual known as "Ka-Ka," the son of the tenant who leased the second-floor apartment from C.P.
>
> Law enforcement authorities launched an investigation during which a witness identified defendant as the black male seen running to the

passenger side of an idling green Mercedes shortly after the first shooting.[*]  Other witnesses reported to police that approximately one month later, at a Christmas Eve party, they saw defendant attempting to clean a weapon with ammonia.  They asked defendant about it and he told them the gun had been used to kill the first victim, but that the shooting was a mistake; the shooter mistook the victim as the person who fatally wounded the Crips member the previous month.

On February 6, 2008, in an unrelated matter, an Elizabeth homeowner, while evicting his tenant, K.G., discovered a box containing guns in K.G.'s apartment. The landlord contacted police, who determined, following an examination by a firearms expert, one of the guns was linked to the fatal shootings of E.H. and C.P.  Police interviewed K.G., who stated he purchased the guns the previous month from a tall black male with dreadlocks, whom he did not know, but whom he recognized from the neighborhood.  Police presented K.G. with a photo array from which he selected B[ryant] L[ee]'s [(Lee)] photograph as the person from whom he had purchased the guns.  Police arrested defendant, [Lee], and M[onte] F[oster] [(Foster)], identified, during the investigation, as the driver of the vehicle from which defendant was seen alighting two days following the last shooting.

_____

[*]  "Further investigation revealed that the vehicle purportedly involved was a Chrysler, which had a body similar to a Mercedes.  That vehicle was seen within days of the shooting and was being operated by Foster with defendant as an occupant."  Id. at 4.

[Melendez, No. A-3829-10 (slip op. at 2-4).]

While awaiting trial, [Lee] wrote letters to two individuals, E.S. and J.G., asking each to give the letters to K.G. The letters instructed K.G. to recant his statement about the gun transaction. In addition, the letter to J.G. asked him to convince other witnesses to recant statements they had given to police.

[Id. at 5.]

We noted:

The State's theory of the case was that the crimes were committed in retaliation for the killing of another Crips member. This theory was based upon testimony presented at trial from a number of witnesses. S.F. and B.G. testified that at a Christmas Eve party the month following the shootings, defendant told them that E.H.'s shooting had been a mistake, as the person who shot him mistakenly believed he was shooting at "Ka-Ka," Twin's rumored killer. Defendant also told them he fired the shot which fatally wounded C.P. He explained to the two women that "it was all [a] gang-related attempt to shoot Ka-Ka." S.L., Ka-Ka's mother and C.P.'s second-floor tenant, testified that on the morning of the shooting, Ka-Ka was at home, asleep in his bedroom.

[Id. at 8-9 (alteration in original).]

The jury convicted defendant on all counts of the indictment that charged

him

with two counts of conspiracy to commit aggravated assault, N.J.S.A. 2C:12-1(b)(1), (2) and (4), and N.J.S.A. 2C:5-2 . . .; two counts of first-degree murder, N.J.S.A. 2C:11-3(a)(1) and/or (2) . . .; three counts of second-degree aggravated assault, N.J.S.A. 2C:12-

4

1(b)(1) . . .; three counts of third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2) . . .; three counts of fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(4) . . .; two counts of second-degree possession of a weapon (firearm) for unlawful purpose, N.J.S.A. 2C:39-4(a) . . .; three counts of third-degree unlawful possession of a weapon (handgun), N.J.S.A. 2C:39-5(b) . . .; third-degree hindering apprehension, N.J.S.A. 2C:29-3(a)(3) . . . and third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(1) . . . .

[Id. at 4-5.]

In defendant's petition for PCR, he claimed in part that trial counsel provided ineffective assistance by failing "to call Lee and Foster to testify" at trial. Melendez, No. A-3940-15 (slip op. at 4). We noted:

> The PCR judge found there were no affidavits from Lee and Foster, and trial counsel exercised reasonable strategy in not calling them as witnesses. The judge noted that Lee and Foster, who had pending charges relating to this matter, would have either invoked their Fifth Amendment right not to testify, or their testimony would have damaged the defense by presenting evidence of co-defendants' shared gang membership with defendant. The judge also found that, given the considerable amount of evidence presented against defendant, Lee's and Foster's testimony would not have changed the outcome.
>
> [Id. at 4-5.]

We affirmed the denial of PCR, noting that "deciding which witnesses to call to the stand is 'an art,' and we must be 'highly deferential' to such choices,"

5

A-1151-22

id. at 8; and "[w]here the defendant asserts that his attorney failed to call witnesses who would have exculpated him, 'he must assert the facts that would have been revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification.'" Id. at 9 (quoting State v. Petrozelli, 351 N.J. Super. 14, 23 (App. Div. 2002) (internal quotation marks omitted)).

Defendant filed the motion for a new trial based on affidavits supplied by co-defendants Lee and Foster. In his February 4, 2019 certification, Lee certified "[o]n or about the 21st day of February 2012 . . . [he] pled guilty to causing the death of [E.H.] and [C.P.] . . . [and] accepted full responsibility for the crimes committed against" E.H., I.D., and C.P. Further, Lee certified that defendant "was not involved in the shooting death of [E.H.], the shooting of [I.D.], or the shooting death of [C.P.] in any capacity."

Instead, Lee certified "[o]n or about the 12th day of November 2007, . . . Charles "Pookie" Holmes [(Holmes)] and . . . [he] . . . opened fire[] using a .40 caliber handgun, shooting victims" E.H. and I.D. Lee further certified "[o]n or about the 14th day of November 2007, . . . [he] used the same .40 caliber handgun to shoot at the house . . . . One shot went through the window and hit [C.P.] in the neck."

Lee certified defendant "was not involved in the crimes committed against" E.H., I.D., or C.P. Lee sought to "confirm[ defendant] was not with [him] at the time."

In his January 25, 2019 certification, Foster certified that "[o]n the 27th day of February 2012, . . . [he] accepted a plea agreement . . . to the charge of hindering apprehension." Further, he certified that "[o]n or about the 12th day of November 2007, [he] did in fact own a . . . Chrysler Crossfire. During that time [he] did in fact lend the Chrysler Crossfire to a friend. The friend that [he] len[t] the vehicle to was named . . . Holmes." Further, Foster certified he "did not lend the . . . Chrysler Crossfire to" defendant.

The trial court granted an evidentiary hearing, finding defendant established a "prima facie showing of newly discovered evidence based on the affidavits of Lee and Foster" under Rule 3:22-10(b). Lee testified at the hearing.[1]

Lee stated in 2012—"almost immediately" within "a week or two"—after he was sentenced, he wrote a letter to defendant's attorney and explained that he "was sorry for [defendant] still being in jail, because . . . [Lee] was the one who

---

[1] The trial court explained "[d]efendant decided to proceed in th[e] matter, relying solely on the testimony of co-defendant Lee, for reasons that [we]re unknown but d[id] not relate to production of Foster."

did it, and [defendant and he] w[ere] never together." He advised he indicated he "was not willing to say who [he] was with." Lee stated he wrote the letter from the Union County jail, however, he did not remember the address he mailed the letter to and did not have a copy of the letter. Lee stated he never heard back from the attorney or wrote to the attorney again. At the time of the hearing, the attorney had passed away.

In addition, Lee denied being aware that Holmes had died on August 10, 2011, before he entered his plea. Nonetheless, Lee explained the "number one [rule] in Cripping is no snitching, so no snitching is no telling nothin[g] to the police, to the prosecutors, no telling nothin[g]." Even though Holmes was dead, Lee stated he was still concerned he would be viewed as a snitch. He explained he no longer "believe[d] in [the] same ideologies," has a daughter, did not want that type of life, and was "trying to get home."

The trial court issued a sixteen-page written opinion that accompanied the order denying defendant's motion. Initially, the court stated:

> [H]aving had the opportunity to see and hear Lee, this [c]ourt finds that his testimony is not credible based upon the manner in which he testified, his bias in favor of defendant, his childhood friend, and the convenience of naming a now-deceased member of his gang as his accomplice.

The court explained, "Lee's testimony was not forthright and at times evasive" and Lee answered questions—as to "simple matters"—"vaguely" and "exhibited clear signs of frustration." In addition, the court noted Lee's prior convictions "of multiple crimes, including witness tampering with the attempt to induce a witness to lie" were not "automatic indicator[s] of [a] lack of credibility," but did "enter into th[e c]ourt's finding of a lack of candor on Lee's part."

Moreover, the court found "it appeared that Lee was purely using Holmes in order to exculpate his friend . . . and Holmes'[s] death [wa]s an opportunity for Lee to provide the name of an individual that he has previously withheld, with full knowledge that Holmes cannot provide an alternative theory himself."

Further, the trial court found Lee's testimony regarding sending defendant's attorney a letter was "questionable." The court noted: (1) the attorney "now-deceased, ha[d] no way of confirming or denying the existence of this communication"; (2) there was "no confirmatory proof, such as a copy of the document"; and (3) "[i]t defie[d] logic to believe that [the attorney] would have received such exculpatory information and ignored it."

Lastly, the trial court weighed "Lee's current claim that Holmes, not defendant, was Lee's accomplice . . . against the proof beyond a reasonable doubt

presented at trial that defendant was a principle or an accomplice in both homicides." The court noted "[t]here was substantial evidence admitted at trial, including defendant having motive, being in possession of the murder weapon and the car[,] and being at the . . . home where witnesses heard him make admissions that inculpate[d]" him. Further, the court considered the denial of PCR and stated the PCR judge found that summoning Lee would have: (1) "actually strengthened the State's case because [Lee's] testimony would have allowed the State to show the relationship between the defendants and their shared gang affiliation"; (2) "corroborate[d] the State's theory of defendant's motive"; (3) "support[ed] the State's case that defendant was in possession of the murder weapon"; and (4) "supported the State's case in many respects and would not have provided any probability that a jury would come to a different outcome."

Therefore, the trial court concluded "based on the incredible testimony of Lee, considering the probable effect of his testimony, and the weight of the evidence produced at trial against defendant, . . . the newly proffered evidence would not probably change the verdict against defendant in a new trial."

Defendant presents the following argument for our consideration on appeal:

10

AS DEFENDANT HAS SHOWN THAT THE NEWLY DISCOVERED EVIDENCE WAS OF THE CHARACTER THAT WOULD HAVE CHANGED THE RESULT OF THE TRIAL, HE WAS ENTITLED TO RELIEF.

Defendant contends "Lee provided detailed and credible testimony that defendant was not involved in the crimes.  Had Lee's testimony been presented to the jury, there was a reasonable probability that the verdict would have been different."  Defendant emphasizes that at trial, his "mother and girlfriend testified that on the night of the first shooting, he was at home and did not leave until the next morning to go to work" and "[a]s for the [second] homicide, [his] mother said he was at work."  Therefore, defendant argues:

> As circumstances changed with Holmes['s] death, Lee came forward to tell the truth.  Had the jury heard the combined testimony of defendant's mother, girlfriend and Lee, there was [a] reasonable probability that the jury's verdict would be different if a new trial were granted.  The motion court failed to weigh the effect of the totality of the exculpatory evidence available to the defense with Lee's testimony and further failed to consider that defendant's constitutional right to present a complete defense was at stake.  The constitutional right to present a defense confers on the defendant the right to argue that someone else committed the crime.

"We review a motion for a new trial decision for an abuse of discretion." State v. Fortin, 464 N.J. Super. 193, 216 (App. Div. 2020).  "[T]he exercise of that discretion will not be interfered with on appeal unless a clear abuse has been

11

shown." State v. Armour, 446 N.J. Super. 295, 306 (App. Div. 2016) (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)). An abuse of discretion "arises when a decision 'is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigr. & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)).

The New Jersey Supreme Court has held

> that to qualify as newly discovered evidence entitling a party to a new trial, the new evidence must be: (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted.
>
> [State v. Carter, 85 N.J. 300, 314 (1981).]

"Under prong one of the Carter test, we first must look to the issue of materiality as that term pertains to the defense in a criminal case." State v. Ways, 180 N.J. 171, 188 (2004). "Material evidence is any evidence that would 'have some bearing on the claims being advanced.'" Ibid. (quoting State v. Henries, 306 N.J. Super. 512, 531 (App. Div. 1997)). Therefore, "evidence that

12

supports a defense, such as alibi, third-party guilt, or a general denial of guilt would be material." Ibid.

"Determining whether evidence is 'merely cumulative, or impeaching, or contradictory,' and, therefore, insufficient to justify the grant of a new trial requires an evaluation of the probable impact such evidence would have on a jury verdict." Id. at 188-89. Thus, "the focus properly turns to prong three of the Carter test, whether the evidence is 'of the sort that would probably change the jury's verdict if a new trial were granted.'" Id. at 189.

"Prong two of the Carter test recognizes that judgments must be accorded a degree of finality and, therefore, requires that the new evidence must have been discovered after completion of trial and must not have been discoverable earlier through the exercise of reasonable diligence." Id. at 192.

"Newly discovered evidence must be reviewed with a certain degree of circumspection to ensure that it is not the product of fabrication, and, if credible and material, is of sufficient weight that it would probably alter the outcome of the verdict in a new trial." Id. at 187-188. "[M]otions based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations." Herrera v. Collins, 506 U.S. 390, 417 (1993). "Appellate

13

courts should defer to trial courts' credibility findings that are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience." State v. Locurto, 157 N.J. 463, 474 (1999). "[T]he reviewing court must engage in a thorough, fact-sensitive analysis to determine whether the newly discovered evidence would probably make a difference to the jury." Ways, 180 N.J. at 191.

"[A]ll three prongs of th[e Carter] test must be satisfied before a defendant will gain the relief of a new trial." Id. at 187. "The defendant has the burden to establish each prong is met." Fortin, 464 N.J. Super. at 216 (quoting State v. Smith, 29 N.J. 561, 573 (1959)).

Applying these well-established legal principles, we conclude the trial court did not misuse its discretion in denying defendant's motion for a new trial. The court properly held the evidentiary hearing, see Collins, 506 U.S. at 417, and "engage[d] in a thorough, fact-sensitive analysis." Ways, 180 N.J. at 191. The court made detailed credibility findings tethered to the evidence and Lee's presentation, which are entitled to deference. See Locurto, 157 N.J. at 474.

In addition, the trial court properly applied the Carter test. Under the first prong, the court found "that, if deemed credible, Lee's testimony is material to

14

the issue of who committed the murders." However, the trial court did not find Lee credible.

Moreover, under prong three, the trial court found Lee's testimony would probably not change the jury's verdict. In reaching its conclusion, the court found Lee's testimony "incredible." Thus, the testimony "would [not] probably change the jury's verdict if a new trial were granted." Carter, 85 N.J. at 314. In addition, the trial court considered the testimony in light of the evidence offered against defendant and reached the same conclusion.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division