STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. EDGAR SMITH, ALSO KNOWN AS EDGAR H. SMITH, DEFENDANT-APPELLANT.

Argued April 7, 1959—Decided May 4, 1959.

562

*Mr. William C. Brudnick,* Special Assistant Prosecutor, argued the cause for plaintiff-respondent (*Mr. Guy W. Calissi,* Bergen County Prosecutor, attorney).

*Mr. John E. Selser* argued the cause for defendant-appellant.

The opinion of the court was delivered by

FRANCIS, J. The defendant Smith was convicted of murder in the first degree and was sentenced to death. The conviction was affirmed unanimously by this court in a comprehensive opinion which concluded with the observation:

"A reading of the record firmly and impressively convinces the impartial mind of the truth of the charge made against the defendant beyond a reasonable doubt." 27 *N. J.* 433, 466 (1958).

The execution was scheduled for the week of August 17, 1958. On August 8 defense counsel applied for a new trial primarily upon the ground of newly discovered evidence. After a hearing before the judge who had presided at the trial, the application was denied. This appeal attacks the legal propriety of the denial.

The original 31-page opinion of Justice Wachenfeld sets forth the circumstances of the homicide in detail. For purposes of perspective, however, repetition of certain of the facts which are pertinent to this proceeding seems necessary.

On March 4, 1957, at about 8:35 P. M., the decedent, Victoria Zielinski, 15 years of age, was walking along Wyckoff Avenue, Ramsey, New Jersey. She had visited a friend and was on her way home, more than half a mile away. The defendant Smith, who knew her casually, happened along in a borrowed car and undertook to drive her there. Instead of going directly to her home, he drove to an isolated sand pit in the neighborhood and parked. There, according to his confession, for no apparent reason the young lady said she was going to get out of the car and walk home. She said also that she intended to tell her father that he was "like the rest of the guys." He tried unsuccessfully to prevent her from getting out and when he tried to follow her, she began to yell and slap at him. He then swung at her "as hard as" he "could" with his right hand; "I don't know whether it was a fist or a slap or what." He did not know if he actually struck her. From that point on, things were vague in his mind, i. e., "that's where somebody pulled the switch." He next remembered getting back into the car alone. In the interval of vagueness he did not know whether he had struck at her more than once or whether he did so with an object other than his hand. He had a "feeling of running somewhere" or "chasing somebody." He thought he recollected "running in the sand with my shoe off." On getting back into the car, his right foot was cold; later he became aware that he had lost his shoe. When he left the sand pit, Victoria's school books and pocketbook were in the car. After proceeding a short distance, he thought he probably threw them into the woods. In accordance with information furnished by him, the police later located them there. On reaching home, he realized that his khaki trousers and socks were bloody. He changed the trousers, went back to the pit with a lantern, and retrieved his right shoe. Later the trousers, socks, and shoes were disposed of in the manner referred to in Justice Wachenfeld's opinion. 27 *N. J.* at *pages* 444–445.

At the trial Smith testified that he and Miss Zielinski quarreled while they were parked at the sand pit and he told her to get out of the car. She did so and started walking down the road. The events that allegedly occurred thereafter are recited in the earlier opinion as follows:

"A few moments thereafter, while he was preparing to leave the pit, defendant heard a commotion and saw two figures coming up the road. He quickly got out of the car and his 'bad' ankle, which had been struck by a bowling ball earlier in the day, collapsed under him, his right shoe coming off. Since the identities of the oncoming persons were unknown and it was a lonely spot, he seized the baseball bat from the back seat of the car for protection.

As the figures approached, he recognized them as Victoria and D. H. Victoria was bleeding from a cut over her ear. Smith asked D. H. what had happened, and the latter replied the girl had fallen on the road. Smith examined the wound and in the process got blood on his hands and trousers. Feeling she should be taken to a doctor, he placed her in the automobile, but D. H. grabbed her and forcibly pulled her out, telling Smith to leave her alone, that he, D. H., would take care of her. Victoria pleaded with Smith for succor, but since D. H. knew her much better than he, Smith decided he should not interfere further and drove off, leaving his shoe and the baseball bat behind." 27 *N. J.* at *pages* 446–447.

Smith's home was a short distance away. He drove there, washed up, changed his trousers, telephoned Joseph Gilroy, whose car he had been driving, and departed at about 9:10 P. M. to pick Gilroy up. On the way, he revisited the sand pit and retrieved his shoe.

Repetition of the above portion of the facts of the tragedy has been engaged in to point out the time element involved. On the basis of Smith's testimony at the trial, he picked up Miss Zielinski at about 8:35 P. M. (although at one point he said it was about 8:40 or 8:45 P. M., "it could have been later or could have been earlier."). He must have left Miss Zielinski and D. H. at the sand pit before 9 P. M., because after driving home, talking to his wife (who testified he arrived home shortly before 9 P. M.), washing up, changing his trousers and socks, attempting unsuccessfully to start a gasoline heater in the trailer where they lived, and making

his telephone call, he left home at about 9:10 P. M. to pick up Gilroy. Thus the import of his allegation at the trial was that D. H. appeared at the sand pit shortly before or around 9 P. M. And the conclusion which the defense sought to have the jury reach was that D. H. committed the murder.

But impressive evidence, accepted by the jury at the trial as credible, showed that D. H. was at work in the Wyckoff Pharmacy from 6 until shortly after 9 on the evening in question. According to the pharmacist, at about 8:35 or 8:40 P. M. he was sent in the employer's station wagon to pick up some merchandise at another drug store in Ridgewood, New Jersey, normally an 18- to 20-minute round trip, according to a police officer who timed it. D. H. returned to his employer's place of business at about 9 P. M., or shortly before, with the package he had been sent for and did not leave again until a short time after 9 P. M.

D. H. testified that on quitting work he drove his own car to Pelzer's Tavern in Mahwah, entering there at approximately 9:20. (On the way at about 9:05 or 9:10 he passed Myrna Zielinski, one of Victoria's sisters. Every one concedes this fact.) After a stay there of about 20 minutes, he left and went to Pellington's milk bar on Route 17 in Ramsey. He reached that place at about 10 P. M. Corroboration was furnished by witnesses who saw him at both places at the times indicated. Thereafter, he drove to his home, also in Ramsey, arriving there around 10:15 or 10:30. He was in bed at 11 P. M.

## I.

 The new trial application consisted principally of an effort to discredit D. H.'s testimony at the trial that he had been in Pelzer's Tavern on the night of the killing and was home in bed at 11 P. M. that night.

Attached to the moving papers was an unsworn statement of Herbert Pelzer, owner of the tavern, dated July 3, 1958, in which he stated:

"That on the evening of March 4, 1957, I was operating my tavern in the normal pursuit of business. That on that particular night, March 4th, Charles Rockefeller known as 'Rocky' was in my establishment at 7:30 p. m. when his father came to pick him up and they both went out of my tavern. I did not see Charles Rockefeller again that night. Also, a man named [D. H.] was not in my place of business on March 4th at any time. However, on Tuesday, March 5th and thereafter, [D. H.] was constantly after me to say that he and Rockefeller were in my tavern from 9:30 p. m. and on during the evening of March 4th. The other men who were in my tavern that evening were Judge Young, Steve Wastog known as 'Lover,' Tony Mihok and they all know neither one of the men named, that is [D. H.] or Rockefeller, were in my place of business on the evening of March 4, 1957. * * *"

A second statement, attached and also unsworn, was signed by George W. Self, a United States Army private, who married Mary Faye Zielinski, sister of the decedent, subsequent to the homicide. The paper is dated May 30, 1957, and asserts that on the fatal night he was out with Mary. They returned to her home about 10:15 or 10:30 and learned of Victoria's absence. They went out to look for her and stopped at a place known as Robby's Corral to inquire if any one had seen her. Self went in and made inquiry of the owner and "one or two" other men who were there. Mary remained in the car. He was told that they had not seen her. While driving around town (he said) "[W]e saw [D. H.] two or three times, in the evening in his two-toned green Ford. One time in the heart of Ramsey and one time on Franklin Turnpike going toward Route 17." He said also that he saw H. "just a little before 10:00 p. m. as we were going to Mary's home the first time before we learned she was missing." Neither Self nor Mary Zielinski had been called as a witness at the trial.

At the hearing on the effort to obtain a new trial, Pelzer was called to testify. The procedure followed on his examination was most unusual. On direct examination, the signed statement mentioned above was shown to him. He conceded he signed it and that with one exception the contents were true. Then it was marked as an exhibit. This course was

improper. The witness was in court; the affidavit was hearsay. The best and primary evidence was his oral testimony. Whatever he had to offer in the way of alleged newly discovered evidence should have been introduced in the conventional manner. It would have been proper for the prosecutor to utilize the statement on cross-examination if the oral testimony deviated therefrom, and in appropriate circumstances it would have been permissible for the witness to use it to refresh his recollection. Of course, the method of handling the matter was not prejudicial to the defendant; it was advantageous to him. And in view of the seriousness of the case, we accept the record as presented.

After the statement had been introduced Pelzer (who had a criminal record for aiding and abetting bookmaking) testified that D. H. was not in his place of business between 7:30 P. M. on March 4, and 2 A. M. on March 5, 1957. He said also that Judge Young, Tony Mihok and Steve Wastog were present that evening.

On cross-examination it developed that about a week or ten days after the homicide he had given a voluntary statement to representatives of the prosecutor's office that D. H. was in the tavern on the night of March 4. Further, he admitted that before his statement was given to the State, an investigator for the defendant, one A. D. Nicol, had interviewed him. He told Nicol that D. H. was in his bar on March 4 from "9:30 on." Prior to the July 3, 1958 statement, he never informed Mr. Selser or Nichol that D. H. was not there that day.

On being asked why he told the prosecutor that D. H. was in the tavern, he said: "It came back to me"—meaning "That's the statement I made to Mr. Nicol." At this juncture, the court repeated the question as to why he had so advised the prosecutor. He said: "I wasn't sure." He came to the conclusion that D. H. had not been in his tavern "a few months later," but this was after the trial was over. The record contains no explanation as to when or how this new conclusion came to the attention of the defense.

Pelzer admitted that he erred when he said in his statement of July 3, 1958 that D. H. asked him on March 5, 1957 to say that Charles Rockefeller also was in the tavern on the previous evening. Moreover, he asserted therein, and on his direct examination swore that it was true, that Rockefeller left the place at 7:30 P. M. on March 4 when his father came to pick him up and "they both went out of my tavern." But on cross-examination he said he saw Rockefeller leave alone and assumed that someone picked him up. The State produced Rockefeller's father, who testified that on March 4, 1957 he was at work as a chef in the Saddle Inn, Route 17, Upper Saddle River, from 4 P. M. until midnight, and that at midnight his son picked him up there to drive him home.

The July 3, 1958 statement recites that on March 5, 1957, and thereafter D. H. "was constantly after me to say that he and Rockefeller were in my tavern from 9:30 p. m. and on during the evening of March 4th." His testimony limited the alleged request to the evening of March 5 when it was said to have occurred two or three times. And it was couched in somewhat different terms while he was on the witness stand; it was "[r]emember, I was in here last night from 9:30." Nothing more was said. Pelzer made no answer; he "walked up the other end of the bar."

At first Pelzer testified that he did not recollect who was in the tavern on March 5 when D. H. allegedly spoke to him. Then he recalled, on being reminded by the prosecutor, that the place was crowded that night; reporters, detectives and others were there. The reason for the lapse was that his "memory goes once in a while." But he said the crowd stayed at one end of the bar and D. H. called him to the other end and whispered the request on two or three occasions. Later, he qualified the location of the crowd by placing them "from the middle up," and then he thought there "might have been one or two people" from the middle down to where D. H. called him and engaged in the whisper. At no time did he answer or make any comment; he simply walked away.

During the course of the murder trial Pelzer was in court for two days in response to a defense subpoena. However, he was never called as a witness. Except for a discussion wholly unrelated to the case, the only conversation he had with Mr. Selser in those two days was to inquire as to whether he would be needed. The answer was that he would not be called "today."

Trial counsel, Mr. Selser, took the witness stand on the application. He conceded Pelzer's presence at the trial under subpoena. But he did not summon him as a witness, since Pelzer said he "was going to say" that he did not remember whether or not D. H. was in the tavern on March 4 because the prosecutor's men threatened him with the loss of his liquor license on account of sales to minors, if he testified for Smith. This alleged threat was reported to no one. On inquiry at the oral argument as to the reason for this failure, we were advised that counsel did not believe him. Moreover, Selser said Pelzer was "under the influence of intoxicating liquor" at the time. In the course of the prosecutor's cross-examination on this phase of the matter, Pelzer denied that he was intoxicated and said he could not recall having told Selser about a threatened loss of his license if he testified for the defendant. But, as already noted, he conceded that his original information to the prosecutor had been given without duress or coercion.

The victim's sister's husband, George W. Self, was called. He testified that on the night of March 4, 1957, while he and Mary Zielinski were riding around looking for Victoria, he thought he saw D. H. at Robby's Corral around midnight and again near the Ramsey Police Station at about 1 A. M. He did not actually know whether he had seen D. H.; he "didn't know him that well to say for sure," having seen him only "a couple of times before." His thought was generated by Mary who remarked at the time that "it was him or it looked like him." And Self testified that he did not tell Nicol, the defense investigator, that he had seen D. H. a little before 10 P. M. on March 4, as his statement

attached to the application for new trial asserted. It appeared, also, that Self had given a statement to the prosecutor in question-and-answer form prior to the hearing. In the course of it, in explaining that error, the following took place:

"Q. Then he put something in there that isn't the truth?
A. Yes.
Q. And that is a plain lie?
A. As I told you before, I didn't like [D. H.]. Why should I worry where he is at?
Q. But the investigator put down words that were a lie about an individual in a murder investigation and you signed it?
A. Yes."

This interrogation was included in the cross-examination of Self. However, the complete statement was put in evidence, and in fairness we add the question and answer which follow those set forth above:

"Q. Just because you didn't like [D. H.]?
A. No. It wasn't that. Like I said, I don't know what he wrote. I didn't read it too close. I didn't say that to him."

Mrs. Self (formerly Mary F. Zielinski), who, according to her husband's statement, "hated" D. H., testified that she saw him at Robby's Corral about midnight on March 4, 1957. However, she did not go in. Self entered and inquired of Robby about Victoria. According to Self, Robby and one patron sitting at the end of the counter were the only persons present, although it is not clear whether he meant in addition to the person he thought was D. H. He was aware that D. H. was acquainted with Victoria. But he did not testify that any inquiry about her was put to D. H.

The three persons who, according to Pelzer, were in his tavern on March 4, 1957 and who knew that neither D. H. nor Rockefeller was there, were called by the State. Judge J. Frank Young, the municipal magistrate of Mahwah, testi-

fied that to the best of his recollection he was not in the place that evening. He said:

"I have a country office and have to have evening appointments. My diary indicates for that evening I had two appointments, one at 8:00 and one at 8:30.

The one at 8:30 was the preparation of an income tax return for a partnership farming concern in our town which required considerable information to fill out the 1040F and in turn I had to get the information for the two individual returns including the wife of one of the partners who also was employed and, as some farmers do, they didn't keep too good books.

I feel sure that it was at least 10:00—at the least quarter of 10:00—before I could have possibly been through."

However, he could not say categorically that he had not been in the tavern that evening. He did not know D. H.

Mihok could not remember being present at all on March 4. He testified that after the trial "when they were trying to bring this case back again" Pelzer said to him: "Don't worry, you are going to be there, you are going to be there." Further, Mihok maintained that he did not know D. H. Wastog conceded being in the tavern at about 6:30 or 6:45 after he finished work and remaining there for about an hour and a half. Then he went home.

Wastog had been subpoenaed by the defense during the trial, although previously he had given the same information to the investigator about his visit to the tavern on the evening in question. He was not called upon to testify. According to Mr. Selser, this was because he was "going to say" that he did not remember being in the tavern on March 4 and also because, like Pelzer, he, too, had been drinking. Mr. Selser said, also, that prior to the trial his investigator had told him that Wastog had informed him that he (Wastog) had been in the tavern until approximately 11 P. M. However, no such fact appears in the statement given to Nicol by Wastog on May 26, 1957. And Nicol was not produced as a witness.

At the hearing a number of grounds for a new trial were presented. The discussion thus far has been confined sub-

stantially to the alleged newly discovered evidence because of the stress placed upon it by the defendant. The trial court held that it was not credible and that it did not qualify as newly discovered in the legal sense.

The character of evidence to qualify as newly discovered and thus to provide a basis for the granting of a new trial is well known. It must be material to the issue and not merely cumulative, nor impeaching nor contradictory; it must have been discovered since the original trial and not discoverable prior thereto by the use of reasonable diligence; and finally its probative force must be such as to persuade the discretion of the trial court that if introduced at a new trial a contrary verdict ought to result. As to the last element, the test is probability and not possibility. *State v. Bunk*, 4 *N. J.* 482, 486 (1950); *State v. Haines*, 20 *N. J.* 438, 444 (1956). The burden of establishing the necessary factors is upon the defendant. Such motions are addressed to the sound discretion of the court; and the exercise of the discretion will not be interfered with on appeal unless a clear abuse of it is shown. The judge, who sat on the original trial, as here, is in a peculiarly advantageous position to evaluate the showing made for a new trial and particularly the credibility of the witnesses. Consequently, great weight must be given to his determination. Any other rule would be completely disruptive of the judicial process. But because life is at stake, we have paused and considered the entire record carefully in order to appraise fully the discretionary act under review.

The thrust of the Pelzer evidence is to attack the credibility of D. H.; to endeavor to show that he was not present in the tavern on the fatal night around 9:15 or 9:20, or engaged in his employment until shortly after 9 P. M. And if the premise that he was not there be accepted, the suggestion is that defendant is corroborated thereby in his assertion that D. H. was at the sand pit with Victoria shortly before or around 9 P. M. and that Smith left them at that site.

In order to reach the intrinsic merit of the issue, we pass

the argument of the State that on its face such proof is merely cumulative, and by inference contradictory of D. H.'s testimony at the trial.

The trial judge, who was familiar with the entire matter, after a full hearing in which he allowed the defense wide latitude in the introduction of evidence, found Pelzer to be "a thoroughly unreliable, incredible witness, careless with the truth who has made so many varying, unfounded, untruthful statements about the fact of [D. H.'s] appearance at his tavern the night of March 4th that no person, no juror could give any statement he might make in that respect any credibility whatsoever."

Our own view of the substance of Pelzer's testimony is set out above. The mere outline is enough to demonstrate that it does not carry the ring of truth. And study of it in relation to the entire record leaves an abiding conviction of its untrustworthiness. Judged by the most liberal standard, it would not justify this court in declaring that the trial court abused his discretion in rejecting it as a basis for vacating the verdict of the jury.

The assertions of Mr. and Mrs. Self are even more remote in their effect upon the case. The apparent purpose was to provide contradiction for D. H.'s statement at the trial that he was in bed by 11 P. M. on March 4, 1957. According to Self, he and his wife disliked him for reasons having no relation to the tragedy in question. Whatever their motivation, we agree with the trial court that the nebulous quality of the testimony, its uncertainty, and the fact that Mrs. Self was not produced as a witness at the original trial, deprive it of the evidentiary impact which it should have to warrant a new trial. And this conclusion is inescapable whether their testimonial utterances are treated in isolation or in company with those of Pelzer.

The observations thus far of themselves provide the answer to the last element to be considered in reviewing the trial court's decision, i. e., whether the additional evidence would probably result in a different verdict upon a new trial. In

this connection there is no doubt that the strength of the State's proof of guilt at the original trial is a factor to be weighed. For the more conclusive the evidence against the defendant, the heavier must the burden be to show that the proffered augmentation of the record ought to induce a jury to bring in a contrary result. We have re-examined the original record, as well as the earlier opinion, and find no basis whatever for withdrawing from or qualifying our determination that the evidence was devastatingly convincing of the defendant's guilt. Appraisal of the allegedly newly discovered evidence has been engaged in with a deep consciousness that our judgment represents the exhaustion of the judicial process. But it has led to concurrence in the view of the trial court that the additional proof probably would not change the result. For these reasons, we find no sufficient basis for a holding that his discretion was abused in denying a new trial.

## II.

In the petition for a new trial, defendant applied to the court to bring in at the hearing Dr. Raphael Gilady, the county medical examiner who performed an autopsy upon the decedent, so that he could be examined further with respect to the time of death. The doctor had testified on the subject at the original trial and had been cross-examined by counsel for the defense. The purpose of the new request was this: the victim's skull and brain were so destroyed that death was immediate, according to the doctor. Smith's position at the trial was to the effect that he could not have had any contact with her after 9:30 P. M. So if the death could not have occurred prior to that hour, he could not be guilty.

According to the trial record, Dr. Gilady's autopsy took place between 12:30 and 1 P. M. on March 5. He certified on the death certificate that the demise occurred "about 10–11 P. M.". It was arguable that some of his testimony was susceptible of the inference that it might have happened

around midnight. Counsel pursued the matter on cross-examination. And the final specific question on the subject was:

"Q. So it was, in your judgment, not later than 11 o'clock—not earlier than 11 o'clock, I mean, or perhaps not later than one?

A. It could have been earlier than 11 o'clock because the prevailing weather was so cold and the body might have stiffened up, according to standard data.

With *rigor mortis* setting in in the normal way and the normal atmosphere and the normal temperature, the time of death would be established at 12 hours, either an hour later or an hour earlier, but with the prevailing weather being as cold as it was, it was very hard to determine when it was exactly."

Proof was adduced to show that the minimum temperature range between midnight March 4 and midnight March 5 was 12 to 22 degress Fahrenheit. At 11:30 P. M. on March 4 it was 29 degrees or less. The readings were taken at the Newark Airport and the meteorologist testified that at Mahwah on the average they would be 10 degrees lower.

Defense counsel argued at length in his summation to the jury that on the basis of Dr. Gilady's testimony, the murder of necessity was committed long after Smith left the sand pit. And in support of his position he quoted verbatim some of the doctor's questions and answers. The prosecutor answered the issue specifically in his closing address and he. too, read additional parts of the medical testimony. The jury resolved the problem by concluding that the defendant killed the decedent.

It is asserted in the moving papers that prior to the present hearing defense counsel communicated with Dr. Gilady and asked whether or not he could say with reasonable probability that the victim could have been killed as early as 9:30 o'clock. And the affidavit sets forth that the doctor declined to discuss the matter unless the court or the prosecutor would authorize him to do so. For this reason, the court was requested to order the doctor to attend the hearing and testify on the subject.

The court declined to do so and we see no abuse of his discretion in the ruling. Manifestly, the doctor and the autopsy report were subject to subpoena and if defendant desired to have them in court, the purpose was simple of accomplishment. Moreover, it cannot escape notice that defendant produced no independent medical proof either at the trial or during the proceedings in the matter now before us.

Nor can it be ignored that the time element with respect to the death was questioned, discussed and argued about at the trial. And although the precise question now desired to be asked was not put by counsel on cross-examination, the relation in time between the alleged hour of defendant's departure from the sand pit and the hour of death was fully exploited. The fact remains that regardless of the uncertainty as to the exact time of death, the jury decided on all of the facts that Smith perpetrated the homicide in the sand pit on the night of March 4 and the record irresistibly justifies their finding.

### III.

Error is predicated on the denial by the trial court of a request to have defendant attend the hearing on the motion for new trial. There was no statement on the motion that Smith was to be a witness; on the contrary, the moving papers contained material which was beyond Smith's personal knowledge. Nor was any representation made to the court thereafter during the hearing or at the conclusion of the testimony or even after the adverse determination that defendant had pertinent information to present in rebuttal. At the oral argument before us counsel stated that Smith could have questioned the assertion of one witness, who had been in attendance at Pelzer's Tavern on the evening of March 4, that he did not know D. H. Accepting the representation, such rebuttal, if introduced, could not have affected the result. Complete elimination of the witness' testimony would be without material significance in the case.

Reference is made to *Article I, par. 10,* of the *New Jersey Constitution,* and to the 5th and 6th *Amendments* of the *United States Constitution,* in support of the contention. The precise question has not been dealt with previously in this State. The weight of authority in other jurisdictions is that the constitutional right to be present applies to the trial, the proceeding for the determination of the guilt or innocence of the accused. It does not require his appearance at a post-conviction hearing on a motion for a new trial. *Barber v. United States,* 142 *F.* 2d 805 (4 *Cir.* 1944), *certiorari* denied 322 *U. S.* 741, 64 *S. Ct.* 1054, 88 *L. Ed.* 1574 (1944) ; *Joseph v. State,* 236 *Ind.* 529, 141 *N. E.* 2d 109 (1957), *certiorari* granted (but limited to a different question) 355 *U. S.* 812, 78 *S. Ct.* 64, 2 *L. Ed.* 2d 30 (1957) ; *Carman v. State,* 208 *Ind.* 297, 196 *N. E.* 78 (1935) ; *State v. Johnson,* 156 *La.* 875, 101 *So.* 250 *(Sup. Ct.* 1924) ; *State v. Dry,* 152 *N. C.* 813, 67 *S. E.* 1000 *(Sup. Ct.* 1910) ; *Rigsby v. State,* 55 *Okla. Cr.* 61, 24 *P.* 2d 1016 *(Crim. App.* 1933) ; *Commonwealth ex rel. Wallace v. Burke,* 169 *Pa. Super.* 633, 84 *A.* 2d 254 *(Super. Ct.* 1951) ; *Cisco v. State,* 160 *Tenn.* 681, 28 *S. W.* 2d 338 *(Sup. Ct.* 1930) ; 23 *C. J. S. Criminal Law* §§ 974, 1504, *pp.* 307, 1325; and *cf. State v. Bentley,* 46 *N. J. Super.* 193, 204 *(App. Div.* 1957). Our rules of criminal practice reflect the general rule. *R. R.* 3 :5–4(*a*) calls for the presence of the defendant "at every stage of the *trial* including the impaneling of the jury and the return of the verdict, and at the imposition of sentence * * *." (Emphasis added.)

Defendant's application, therefore, was addressed to the discretion of the court. Although it might very well have been received favorably since the case is a capital one, the record provides no basis for overruling the action taken.

## IV.

Defendant argues that because the hearing on the quest for a new trial was pursuant to an order which in its

form ordered the State to show cause why "the judgment of conviction * * * should not be set aside and a new trial granted * * * on the ground of the alleged newly discovered evidence," the burden was cast upon the State of sustaining the original verdict. The claim is legally frivolous. Manifestly, the onus of establishing the elements necessary to warrant a new trial is on the defendant. 39 *Am. Jur., New Trial,* § 156.

Defendant prepared the moving papers and activated the matter by the order to show cause in the form chosen by him. Under the rules of criminal and civil practice, such applications are prosecuted by motion, which course should have been followed in this instance. *R. R.* 3:7–11; 4:62–2. The urgency of the cause undoubtedly influenced the trial court to overlook the deficiency in form.

## V.

The sole remaining point raised on appeal is that cross-examination of the witness Wastog was curtailed improperly. There is no merit in it. Our examination of the testimony convinces us that the action taken was a legitimate exercise of discretion, and, in any event, without any prejudicial effect upon the new trial proceeding.

## VI.

The order of the trial court denying a new trial is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For reversal*—None.