**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0995-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

KAFELE K. BOMANI, a/k/a
SHAUN A. GOODING,
SHAWN GOODING, and SHAUN
GRANT,

     Defendant-Appellant.

_____

Submitted May 18, 2022 – Decided June 30, 2022

Before Judges Gilson and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 09-08-2019.

Joseph E. Krakora, Public Defender, attorney for appellant (Michele E. Friedman, Assistant Deputy Public Defender, of counsel and on the brief).

Cary Shill, Acting Atlantic County Prosecutor, attorney for appellant (Katrina M. Koerner, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant appeals from the July 22, 2019 Law Division order denying his motion for a new trial based on newly discovered evidence. We affirm.

Following a 2011 trial, a jury convicted defendant of first-degree attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a)(1), (2); second- and third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), (2); and three weapons offenses, including second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7. The convictions stemmed from defendant shooting a man on a street corner in Atlantic City and fleeing in a sports utility vehicle (SUV). Although the victim survived, he refused to cooperate with the police investigation and never identified the shooter. However, a recording of the shooting was captured on a hotel video surveillance camera and observed by two eyewitnesses.

After appropriate mergers, defendant was sentenced to an aggregate extended term of life imprisonment, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant appealed and we affirmed the convictions but remanded for resentencing in an unpublished opinion. State v. Bomani (Bomani I), No. A-3373-11 (App. Div. March 3, 2014). The Supreme Court denied certification. State v. Bomani, 219 N.J. 628 (2014). On the first remand, defendant was resentenced to an aggregate term of thirty-five years'

imprisonment, subject to NERA.  Defendant again appealed his sentence, and we reversed and remanded for resentencing in an unpublished opinion.  State v. Bomani (Bomani II), No. A-0017-15 (App. Div. Feb. 9, 2016).  On the second remand, defendant was resentenced to an aggregate term of twenty-five years' imprisonment, subject to NERA.  Defendant then filed a petition for post-conviction relief (PCR), which was denied.  We affirmed in an unpublished opinion, State v. Bomani (Bomani III), No. A-5207-17 (App. Div. February 10, 2020), and the Supreme Court denied certification, State v. Bomani, 242 N.J. 497, 498 (2020).

In Bomani I, we detailed the events underlying defendant's convictions as follows:

> At about 2:18 a.m. on October 20, 2007, Lameck Ganda was working in the security booth of the Wyndham Resort Hotel in Atlantic City.  He heard a commotion outside and then saw on the hotel's security camera monitors that four men were arguing and fighting on hotel property.  One of the men was wearing a red shirt and another man was wearing a distinctive multi-colored checkered shirt.  Lameck went outside and spoke to the men, approaching to within about eight feet of them.  He directed the men to leave the hotel property.  The four men went in the direction of the nearby Resorts Casino.
>
> Shortly before 6:40 a.m., Lameck again saw four men on the video monitors who appeared to be arguing. . . .  He zoomed in on the men's faces and saw

A-0995-19

that the disturbance involved the same men that he had approached earlier in the night.

> Lameck then saw the man wearing the checkered shirt go to a dark-colored SUV parked nearby in the street and retrieve something from inside the vehicle. That man walked up to the man in the red shirt and fired a shot at him. The man in the red shirt held his stomach and fled in one direction as the gunman ran back to the SUV and drove away.

[Bomani I, slip op. at 1-3.]

We explained that the police soon learned that the shooting had been "captured and recorded" on "the Wyndham Hotel security cameras" and witnessed by Lameck, as well as another Wyndham Hotel employee, John Lopez. Id. at 4-5.

> Although Lopez did not see the shooter's face, he described his clothing and general appearance consistently with Lameck and the appearance of the man on the video recording. More significant, Lopez had observed and memorized the license plate number of the SUV and gave that information to the police.

> The police quickly matched the plate number to a vehicle registered to defendant . . . at an address on Memorial Avenue, which [was] within four blocks of the site of the shooting.

[Id. at 5.]

Two police officers responded to defendant's address "[a]t approximately 7:07 a.m." and encountered defendant shirtless in the hallway of his rooming

4

house. Id. at 6-7. When questioned about his whereabouts earlier in the night, defendant told police, "he had been at a bar earlier that night" and "that his vehicle was parked at a nearby garage." Id. at 7-8. Ten minutes later, "[a]t 7:17 a.m., an officer found a black Ford SUV in the garage with the license plate number provided by the eyewitness. The officer touched the vehicle's hood and found it to be warm, indicating it had been driven recently." Id. at 8.

After defendant was arrested, "Lameck identified defendant [as the shooter,] but not the vehicle" found at the garage. Id. at 9. On the other hand, Lopez identified the "SUV as the vehicle he had observed immediately before and after the shooting" but "did not identify defendant" as the shooter. Ibid. A subsequent search of defendant's room revealed "a checkered shirt, a light-colored cap, and tan boots" as seen in the hotel surveillance video. Id. at 7, 9. "DNA of two persons was found in the checkered shirt and cap . . . and . . . one of the profiles was consistent with defendant's DNA." Id. at 11. No gun was recovered.

At trial, the manager of the garage where the SUV was parked, Barry Goldstein, testified for the State. Goldstein, who had been in the position for twenty-four years, stated that cars could park at the garage daily "by obtaining a ticket through the ticket spitter," or by using a "proximity card," which was

5

issued to "monthly patron[s]." Goldstein testified that in compliance with a subpoena issued by the State, he had turned over parking garage business records gathered from computerized information, which included: (a) information pertaining to the times cars parking on a daily basis entered the garage on the morning of October 20, 2007; and (b) two proximity cards which belonged to defendant but had lapsed by May 2007. Goldstein was familiar with defendant and testified that defendant continued to park at the garage and "pay by the day" after his proximity cards lapsed. Goldstein explained that at the time of the incident, the garage had no "[monitoring] cameras" available, but he had prepared "a [ticket] dispenser transaction report for . . . October 20, [20]07." According to Goldstein, to prepare the report, "the computer . . . extracted all the tickets that were dispensed from th[e] ticket spitter for the variables that were input." He testified that the report indicated that between 6:44 a.m. and 7:15 a.m., "[t]wo" vehicles entered the garage, one at "6:44 [a.m.] and [one at] 6:55 [a.m.]"

To undermine defendant's claim that his SUV was in the parking garage when the shooting occurred, at trial,

> [t]he prosecution argued before the jury that defendant's vehicle must have been the second of these entries, and the defense argued that defendant would not have had enough time to park his vehicle, dispose

A-0995-19

of evidence, get to his room, undress, and be present shirtless in the hallway of his rooming house in time for [the officer] to find him just after 7:07 a.m.

[Id. at 8-9.]

In addition to the testimony of the garage manager, the two eyewitnesses, the doctor who performed emergency surgery on the victim, the DNA expert, and numerous police officers and detectives who participated in the investigation, a copy of the hotel video surveillance recording was presented to the jury "showing the moment of the shooting and the shooter's flight on foot to the SUV." Id. at 11. We noted that "[b]ecause of the angle of the surveillance view and the quality of the recording, the face of the shooter [was] not clear, although his general appearance, clothing, and actions [were] readily visible." Id. at 11-12. Defendant did not testify at trial. The victim was subpoenaed by the defense and testified "that defendant was not the person who shot him, and he did not know who the shooter was." Id. at 12.

Weeks after the jury convicted defendant, he moved for a new trial based on newly discovered evidence. In support of that motion, he presented a certification from a fellow inmate who claimed that he was a friend of the victim and acquainted with defendant. The inmate stated he had been with the victim at the time of the shooting and claimed that it was not defendant who shot the

7

victim.  The trial court conducted an evidentiary hearing during which the inmate testified.  The court denied defendant's motion for a new trial, finding that the inmate's testimony was not credible.

In 2019, defendant filed a second motion for a new trial based on newly-discovered evidence – this time, based on his discovery that Goldstein had allegedly committed perjury at trial and fabricated records when he testified about the existence of computerized parking records.  Specifically, defendant alleged that in response to his numerous New Jersey Open Public Records Act (OPRA) requests in 2017 and 2018 for "all internet or computerized record data from the [garage's] dispenser transaction machine and cash dispenser machine from October 20, 2007," a representative from the South Jersey Transportation Authority indicated "that there never were any [i]nternet or computerized record data from the dispenser transaction machine or the cash dispenser machine" and "[a]ny paper records" for that "time period . . . were disposed of [in April 2009] pursuant to State of New Jersey Division of Revenue Record Management guidelines."  As a result, defendant proffered that because Goldstein's report was not made until 2011, he must have "presented both perjured testimony and fabricated computerized/electronic physical evidence to the jury."

A-0995-19

On July 22, 2019, without conducting an evidentiary hearing, the motion judge denied defendant's motion for a new trial, finding the newly discovered evidence failed to meet the three-part test enunciated in State v. Carter, 85 N.J. 300, 314 (1981). In a written decision, the judge stated "Goldstein . . . gave specific details as to how the[] records were recorded and maintained," and he "was responsible for keeping such records in the regular course of business and personally prepared the reports in anticipation of trial." Moreover, "Goldstein, as the custodian of these records for this particular garage at that time, was in a much better position to know how these records were kept than an author of an OPRA request response almost a decade later."

The judge added "[e]ven assuming this evidence was material and not merely cumulative and was discovered after the trial and not reasonably discoverable prior to or during the trial, it [wa]s not of a nature as to probably have affected the jury's verdict." Thus, the judge concluded "[t]he allegation that these records were not available at the time of the trial and must have therefore been fabricated, based on information provided to defendant in response to his multiple OPRA requests, does not rise to the level necessary under Carter to merit the granting of a new trial." The judge entered a memorializing order and this appeal followed.

A-0995-19

On appeal, defendant raises a single point for our consideration:

> THE MOTION COURT IMPROPERLY DISCOUNTED THE VERACITY OF THE INFORMATION CONTAINED WITHIN THE OPRA RESPONSE(S), ABSENT AN EVIDENTIARY HEARING, AND OVERLOOKED BOTH THE MATERIAL IMPACT OF . . . GOLDSTEIN'S TESTIMONY AT TRIAL AND THE LIKELIHOOD THAT A NEW JURY WOULD RENDER A DIFFERENT VERDICT BASED UPON THE NEWLY-DISCOVERED EVIDENCE.

"A motion for a new trial based on the ground of newly-discovered evidence may be made at any time . . . ." R. 3:20-2. In Carter, our Supreme Court adopted a three-prong test for granting a new trial based on newly discovered evidence. Under that test,

> [e]vidence is newly discovered and sufficient to warrant the grant of a new trial when it is "(1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted."
>
> [State v. Nash, 212 N.J. 518, 549 (2013) (quoting Carter, 85 N.J. at 314).]

Under prong one, a defendant must show the evidence "ha[s] some bearing on the claims being advanced" and includes evidence that supports a general denial of guilt. State v. Ways, 180 N.J. 171, 188 (2004) (quoting State v.

Henries, 306 N.J. Super. 512, 531 (App. Div. 1997)). This requires the court to engage in "an evaluation of the probable impact such evidence would have on a jury verdict." Id. at 188-89. "[E]vidence that would have the probable effect of raising a reasonable doubt as to the defendant's guilt would not be considered merely cumulative, impeaching, or contradictory." Id. at 189.

Under prong two, "the new evidence must have been discovered after completion of trial and must not have been discoverable earlier through the exercise of reasonable diligence." Id. at 192. To be sure, a defendant must "act with reasonable dispatch in searching for evidence before the start of the trial." Ibid. Under prong three, evidence that "would shake the very foundation of the State's case and almost certainly alter the earlier jury verdict" would clearly qualify. Id. at 189. "[T]he test is whether the evidence if introduced is such as ought to have led the jury to a different conclusion — one of probability and not mere possibility . . . ." State v. Haines, 20 N.J. 438, 445 (1956).

"[A]ll three prongs of th[e] test must be satisfied before a defendant will gain the relief of a new trial." Ways, 180 N.J. at 187; accord Carter, 85 N.J. at 314. Further, it is the defendant's "'burden to establish each prong is met.'" State v. Fortin, 464 N.J. Super. 193, 216 (App. Div. 2020) (quoting State v. Smith, 29 N.J. 561, 573 (1959)). While we acknowledge that the purpose of post-

11

conviction review based on newly discovered evidence "is to provide a safeguard in the system for those who are unjustly convicted of a crime," we are mindful that "[n]ewly discovered evidence must be reviewed with a certain degree of circumspection to ensure that it is not the product of fabrication, and, if credible and material, is of sufficient weight that it would probably alter the outcome of the verdict in a new trial." Ways, 180 N.J. at 187-88.

To that end, motions for a new trial based on newly discovered evidence "should be granted with caution by a trial court since [they] disrupt[] the judicial process." State v. Conway, 193 N.J. Super. 133, 171 (App. Div. 1984) (citing Haines, 20 N.J. at 443). Such motions are "'addressed to the sound discretion of the trial court, and its determination will not be reversed on appeal unless there has been a clear abuse of that discretion.'" State v. Puchalski, 45 N.J. 97, 107 (1965) (quoting State v. Artis, 36 N.J. 538, 541 (1962)); see also State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000). That said, a "reviewing court must engage in a thorough, fact-sensitive analysis to determine whether the newly discovered evidence would probably make a difference to the jury." Ways, 180 N.J. at 191. "The power of the newly discovered evidence to alter the verdict is the central issue, not the label to be placed on that evidence." Id. at 191-92.

A-0995-19

Like with a petition for post-conviction relief (PCR), the mere raising of a claim of newly discovered evidence does not entitle the defendant to an evidentiary hearing. See State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999) ("Although R[ule] 3:22-1 does not require evidentiary hearings to be held on [PCR] petitions, R[ule] 3:22-10 recognizes judicial discretion to conduct such hearings."). Instead, trial courts should grant an evidentiary hearing only if the defendant has presented a prima facie claim for PCR, material issues of disputed facts lie outside the record, and resolution of the issues necessitates a hearing. See R. 3:22-10(b); State v. Porter, 216 N.J. 343, 354-55 (2013). In turn, we review a trial court's denial of an evidentiary hearing on a PCR petition for abuse of discretion. See State v. Preciose, 129 N.J. 451, 462 (1992). The same standard applies to a motion for a new trial based on newly discovered evidence – that is the trial court should grant an evidentiary hearing only if the defendant has presented a prima facie case of newly discovered evidence warranting a new trial under the Carter test. 85 N.J. at 314.

Here, defendant argues the judge "committed reversible error by summarily rejecting the veracity" underlying the OPRA responses "without conducting an evidentiary hearing" and "by overlooking the material impact . . . Goldstein's testimony had at trial, as well as the likelihood that the

newly discovered evidence of his perjury would prompt a new jury to acquit [defendant]." Considering defendant's contentions in light of the record and applicable law, we discern no abuse of discretion or legal error in the judge's decision to deny the motion without conducting an evidentiary hearing because defendant failed to meet his burden of establishing all three prongs of the Carter test. "The absence of any one of these elements warrants denial of the motion." State v. Allen, 398 N.J. Super. 247, 258 (App. Div. 2008).

Critically, as the judge explained, defendant failed to demonstrate that the jury would reach a different result if a new trial were granted. The garage manager's testimony was not the central testimony relied on by the jury. Instead, the jury was presented with surveillance video that captured the shooting and two eyewitnesses, one of whom identified defendant as the shooter. The police also discovered in defendant's room clothing matching the clothing worn by the shooter on the surveillance video and DNA evidence tying defendant to the clothing.

The import of the garage manager's testimony was to show that defendant's SUV had entered the garage after the shooting had occurred to counter the defense theory that the SUV was parked in the garage at the time of the shooting. However, the State also introduced evidence that the SUV's hood

14

was warm approximately thirty-seven minutes after the shooting, "indicating it had been driven recently." <u>Bomani I</u>, slip op. at 8. Thus, undermining the garage manager's testimony would probably not change the jury's verdict if a new trial were granted. In sum, considering the totality of the evidence, we are satisfied that Goldstein's alleged perjury and fabricated documents do not satisfy the <u>Carter</u> test to warrant a new trial.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION