**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2381-23

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

NIRAV PATEL,

    Defendant-Respondent.

_____

Argued December 18, 2024 – Decided February 3, 2025

Before Judges Mayer and Puglisi.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 19-05-0046.

Regina M. Oberholzer, Deputy Attorney General, argued the cause for appellant (Matthew J. Platkin, Attorney General, attorney; Regina M. Oberholzer, of counsel and on the briefs).

David J. Altieri argued the cause for respondent (Galantucci & Patuto, and Cillick & Smith, attorneys; David J. Altieri and Edward W. Cillick, on the brief).

PER CURIAM

On April 20, 2023, a jury found defendant Nirav Patel guilty of second-degree theft by deception, N.J.S.A. 2C:20-4. By leave granted, the State appeals from the February 16, 2024 Law Division order granting defendant's motion for a new trial. We affirm.

We recite the pertinent facts adduced at trial and to provide context to the court's decision. World of Beer Franchising, Inc. (WOB) was a franchise retail alcohol establishment. In 2012, defendant, Will Mingo and Jerrid Douglas entered into an area development agreement (ADA) with WOB, which granted them rights to open twelve franchises in New Jersey and Pennsylvania. The ADA was amended to add a fourth partner, Kenny Lee, and to include franchise locations in New York. The amended partnership operated under the name "Tapmasters."

Each franchise location had its own franchise agreement granting Tapmasters the right to open a WOB franchise at a specific location. Initially, Tapmasters' partners agreed to share profits equally, but over time they agreed to different ownership structures for different franchise locations. The partners executed an operating agreement specific to a location, setting forth the terms of ownership, including each partner's ownership percentage. Upon signing a franchise agreement, Tapmasters was required to contemporaneously provide

WOB a principal owner's guaranty, which also documented Tapmasters partners' ownership percentages in that location.

From January 2007 to February 2014, defendant's family business, Bhagu, Inc., operated The Melting Pot restaurant in Hoboken.  Defendant's sister Sonal Patel[1] purchased the leasehold and liquor license for that restaurant in her name, and defendant, Sonal and their father Bhagvati Patel were signatories to The Melting Pot franchise agreement.  When Sonal moved out of state in 2008, defendant ran the business in her stead.

Tapmasters sought to open a WOB location in Hoboken and defendant, on behalf of Tapmasters, renegotiated a twenty-year lease at that site, closing down The Melting Pot.  At that point, Douglas and Lee were less involved in the WOB business venture, so defendant and Mingo cosigned and personally guaranteed the lease for the Hoboken location.  A May 2, 2014 operating agreement for WOB Hoboken, which was executed under the name of Tapmasters Hoboken LLC, reflected Mingo had a ninety-five percent voting and profit interest and defendant a five percent interest.  The WOB franchisee application indicated Mingo signed as the "[m]anaging [p]artner" of Tapmasters Hoboken LLC.  The

---

[1]  Because defendant's family members share a common surname, we refer to them by their first names.  No disrespect is intended.

principal owner's guaranty, dated March 25, 2015, also reflected these percentages, as did an addendum to the franchise agreement with the same date.

The Tapmasters Hoboken LLC operating agreement provided for additional members to join the company upon meeting certain conditions, and that any additional members' capital contributions were to be used only for the company's business purposes.

Defendant testified he and Mingo were fifty-fifty partners in Tapmasters Hoboken LLC. He did not recall signing any documents indicating he owned five percent, and if he did so, it was only to secure a small business loan. He said he would not have taken any of the actions he did, including soliciting additional funding for the project, if he only owned five percent of Tapmasters Hoboken LLC.

With Mingo's knowledge, in the months prior to the May 2014 operating agreement, defendant sought to raise capital from other individuals and business entities for WOB Hoboken. Defendant's partner in another business, Steve Anatro, assembled a group of six investors, including himself. The investors formed an entity, HOBWOB, as a conduit through which they invested $750,000 in exchange for a thirty percent interest in the WOB Hoboken franchise. The

4

HOBWOB investors individually wired funds or wrote checks to an account held by Bhagu, doing business as The Melting Pot.

At trial, James Scott, the State's investigator, testified Bhagu's bank records showed funds in that account were used to pay defendant's personal expenses unrelated to Tapmasters Hoboken LLC, including mortgage and car payments. Funds were also transferred from the Bhagu bank account into the business accounts of defendant's other investment entities and were also used to pay off debts from The Melting Pot. Scott testified none of the monies were transferred to Mingo or Tapmasters Hoboken LLC, nor were they used to benefit WOB Hoboken.

In August 2014, Anatro asked Mingo about the status of the subscription agreement memorializing HOBWOB's investment in WOB Hoboken. Mingo said he was "shocked" because he was unaware of the investment. After meeting with his attorney the next morning, Mingo sent defendant written notification of his removal as a member of Tapmasters Hoboken LLC. Mingo testified he never approved the HOBWOB capital contribution and neither he nor Tapmasters Hoboken LLC received it.

A-2381-23

On May 8, 2019, a State grand jury indicted defendant on a charge of second-degree theft by deception based on his misappropriation of $750,000 from investors between March and May 2014.

On April 20, 2023, following a six-day trial before a jury and Judge Mitzy R. Galis-Menendez, defendant was found guilty of theft by deception of property valued over $75,000. Sentencing was scheduled for June 16, 2023.

On April 28, 2023, defendant filed a motion for a new trial and a judgment of acquittal, which the State opposed.

During the testimonial hearing on the motion, defendant's sister Lina Patel testified that after the guilty verdict, she, defendant and Bhagvati searched for days through files maintained in their family home. The numerous unlabeled boxes were stored in the family room, dining room and library. At that time, defendant was involved in about thirty businesses, and the family business records stored in the family's home contained hundreds of thousands of documents.

In one of the boxes, Lina discovered an eleven-page, unstapled and incomplete document. One side of a page said "Tilted Kilt," which was a restaurant defendant owned, and the other side said "modification," "World of Beer" and "Bhagu." When she showed defendant, they logged into one of his

6

email accounts and, after inputting different search terms with no results, one search yielded "a whole bunch of emails." Attached to an email was a WOB franchise agreement and addendum dated January 22, 2014, which was signed by defendant for Bhagu. The franchise agreement named Bhagu as franchisee and indicated Bhagu paid a $30,000 franchise fee to WOB. Lina's certification attached Bhagu's bank records indicating it paid $30,000 to "WORLD OF BEE[R] FRANCHISING INC." by wire dated April 9, 2014.[2] Later that day, they found a WOB franchise agreement dated May 7, 2015, also naming Bhagu as franchisee and signed by defendant for Bhagu.

Lina also found an undated but signed principal owner's guaranty for a business entity called Tapmasters II, which reflected a forty percent interest to Mingo and a thirty percent interest each to defendant and Douglas. At the motion hearing, defendant had difficulty explaining where the paper copy of this agreement was found, but testified it was also attached to an April 8, 2014 email from Mingo to Ryan McCarthy, a WOB employee who handled franchise sales.

Benjamin Novello, WOB's Chief Development Officer, testified the company kept copies of all executed franchise agreements. Neither he nor

---

[2] The court's opinion noted that in 2019, the State learned this payment was for a WOB franchise in Chelsea, not Hoboken.

McCarthy could recall signing a franchise agreement for Bhagu, and a search of their records did not disclose either Bhagu franchise agreement produced by defendant in support of his motion. Novello also could not remember whether he communicated with Bhagu about the franchise fee because it purportedly occurred ten years earlier, and was not something he would have remembered.

Novello further testified WOB would not have approved a franchise agreement for anyone besides Tapmasters because of its ADA, and would not have granted both the Tapmasters and Bhagu an exclusive franchise agreement for the same location. Novello also testified the Tapmasters II guaranty concerned an ADA, not a specific franchise. Importantly, he acknowledged WOB had the guaranty in its possession but did not produce it to the State in discovery.

On February 16, 2024, in a twenty-page written opinion, the judge denied defendant's motion for a judgment of acquittal but granted his motion for a new trial based on newly discovered evidence. The judge found the newly discovered evidence was not discoverable by reasonable diligence at the time of trial, and defendant did not fail to timely discover it. She also determined the evidence was not cumulative, was material to the issue, and would probably change the verdict at trial.

A-2381-23

The State presents the following issues on appeal:

I.     THE TRIAL COURT ERRED IN GRANTING
       DEFENDANT'S MOTION FOR A NEW TRIAL
       BASED   ON    NEWLY    DISCOVERED
       EVIDENCE.

       A.     The Newly Discovered Documents Found
              in Defendant's Own Email Account [b]y
              Defendant Himself After a One-Hour
              Search Were Plainly Discoverable [b]y
              Reasonable Diligence if Defendant [H]ad
              Searched in the Four Years Before Trial.

       B.     The Newly Discovered Documents Would
              Not Have Changed the Jury's Verdict.

              1.     The     trial     court    disregarded
                     overwhelming   evidence   that   the
                     "newly  discovered  evidence"  was
                     fabricated.

              2.     The documents do not show that
                     defendant had the authority to sell
                     shares of WOB Hoboken.

              3.     The trial court erred in finding the
                     Tapmasters II guaranty was material
                     because it is cumulative evidence.

A motion for a new trial based upon newly discovered evidence "is
addressed to the sound discretion of the trial court." State v. Johnson, 34 N.J.
212, 222 (1961). "A jury verdict rendered after a fair trial should not be
disturbed except for the clearest of reasons." State v. Ways, 180 N.J. 171, 187

9

(2004). We will not disturb the trial court's decision absent a clear abuse of discretion. State v. Smith, 29 N.J. 561, 573 (1959).

We give great weight to the trial court's determination because it "sat on the original trial" and is, thus, "in a peculiarly advantageous position to evaluate the showing made for a new trial." Ibid.; accord State v. Petrozelli, 351 N.J. Super. 14, 23 (App. Div. 2002) ("In reviewing a trial judge's decision, we give deference to [the judge's] feel for the case because [the judge] had the opportunity to observe and hear the witnesses as they testified.").

A movant seeking a new trial on the ground of newly discovered evidence bears the burden to "demonstrate that the evidence is, indeed, newly discovered . . . ." State v. Szemple, 247 N.J. 82, 99 (2021). "[T]he test to be satisfied under a newly discovered evidence approach is . . . stringent." State v. Carter, 85 N.J. 300, 314 (1981). Courts employ a three-pronged test in deciding whether to grant a new trial motion, in which the defendant must demonstrate

> that the evidence is 1) material, and not "merely" cumulative, impeaching or contradictory; 2) that the evidence was discovered after the completion of the trial and was "not discoverable by reasonable diligence beforehand"; and 3) that the evidence "would probably change the jury's verdict if a new trial were granted."
>
> [Ways, 180 N.J. at 187 (quoting Carter, 85 N.J. at 314).]

"The defendant has the burden to establish each prong is met," State v. Fortin, 464 N.J. Super. 193, 216 (App. Div. 2020) (quoting Smith, 29 N.J. at 573), and failure to meet any of the elements requires denial of the motion. Johnson, 34 N.J. at 223. "[T]he purpose of post-conviction review in light of newly discovered evidence is to provide a safeguard in the system for those who are unjustly convicted of a crime." Ways, 180 N.J. at 188. At the same time, "[t]he jury verdict will be upheld where there is sufficient evidence to support the conviction on [the] charge." State v. Terrell, 452 N.J. Super. 226, 269 (App. Div. 2016).

We first address the second prong, under which "the new evidence must have been discovered after completion of trial and must not have been discoverable earlier through the exercise of reasonable diligence." Fortin, 464 N.J. Super. at 217 (quoting Ways, 180 N.J. at 192). This requirement both accords a degree of finality to judgments and encourages the defense to search for evidence "with reasonable dispatch . . . before the start of trial." Ibid. (quoting State v. Nash, 212 N.J. 518, 550 (2013)).

The State argues the judge erred because defendant failed to act with reasonable diligence and he could have located the documents before or during the trial. We are unpersuaded by this contention.

Lina certified the family searched for "several days" through "many boxes" of "countless files" before finding the documents. Based on Lina's testimony, the judge noted the information was first discovered in "eleven miscellaneous pages in the family's garage," which then led to the email searches. "Considering defendant had invested in approximately seventeen[3] . . . businesses, the evidence was discovered among presumably thousands of documents." Given our deferential standard of review as to the judge's factfinding, we discern no basis to disturb this determination.

We next turn to the first and third prongs. Under the first prong, the court must

> look to the issue of materiality as that term pertains to the defense in a criminal case. Carter, 85 N.J. at 314. Material evidence is any evidence that would "have some bearing on the claims being advanced." State v. Henries, 306 N.J. Super. 512, 531 (App. Div. 1997). Clearly, evidence that supports a defense, such as . . . a general denial of guilt would be material.
>
> [Ways, 180 N.J. at 188 (citation reformatted).]

The first and third prongs are necessarily intertwined. Nash, 212 N.J. at 549. "Determining whether evidence is 'merely cumulative, or impeaching, or contradictory,' and, therefore, insufficient to justify the grant of a new trial

---

3 Lina testified defendant was involved in "thirty-ish" businesses.

requires an evaluation of the probable impact such evidence would have on a jury verdict." Ways, 180 N.J. at 188-89 (quoting Carter, 85 N.J. at 314).

As to the third prong, "the reviewing court must engage in a thorough, fact-sensitive analysis to determine whether the newly discovered evidence would probably make a difference to the jury." Id. at 191.

> The characterization of evidence as "merely cumulative, or impeaching, or contradictory" is a judgment that such evidence is not of great significance and would probably not alter the outcome of a verdict. However, evidence that would have the probable effect of raising a reasonable doubt as to the defendant's guilt would not be considered merely cumulative, impeaching, or contradictory.
>
> [Id. at 189.]

As a result, "[t]he power of the newly discovered evidence to alter the verdict is the central issue." Id. at 191. "The evidence must be 'evaluated in light of the . . . corroborative proofs in the record.'" Fortin, 464 N.J. Super. at 221 (omission in original) (quoting State v. Herrerra, 211 N.J. 308, 343 (2012)). "[T]he third prong . . . presents a mixed question of law and fact, requiring that we give deference to 'supported factual findings of the trial court, but review de novo the lower court's application of any legal rules to such factual findings.'" Ibid. (quoting State v. Behn, 375 N.J. Super. 409, 432 (App. Div. 2005)).

N.J.S.A. 2C:20-4 provides:

13

A person is guilty of theft if he purposely obtains property of another by deception. A person deceives if he purposely:

a. Creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind, and including, but not limited to, a false impression that the person is soliciting or collecting funds for a charitable purpose; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;

b. Prevents another from acquiring information which would affect his judgment of a transaction; or

c. Fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship.

In its closing argument at trial, the State explained its case hinged on two theories relating to defendant's ownership interest in WOB Hoboken and his authority to sell shares to HOBWOB. Relevant to this appeal, the State explained:

> There's only two situations in which [defendant] could have made that sale and I'm just going to go through those briefly. The first one is if [defendant] owned thirty percent of [WOB] Hoboken just as if I had something in my pocket and I want to sell it to you. If he owned thirty percent of those shares he could have taken them and he could have given them to the investors, but he didn't own thirty percent of [WOB]

Hoboken.  It's our argument that he owned five percent at that time of [WOB] Hoboken and so he couldn't take something he owned and sell it to the investors.

The two Bhagu franchise agreements purport to show that defendant, through Bhagu, was the sole franchisee of WOB Hoboken when he accepted the investments from HOBWOB.

We recognize, as did the judge, there are issues of authenticity regarding the newly discovered franchise agreements.  During the testimonial hearing, the judge "watched defendant retrieve the documents from his email which are dated at or around the time of the creation of the agreements and the parties stipulated to this fact."  The contemporaneous emails were sent with the documents "four years before the indictment and seven years before the trial," when defendant had little to no reason to fabricate them.  On the other hand, Novello testified he had no record of the agreements, did not recall signing them, believed his signature was forged, and provided other logistical reasons why he believed the documents were not authentic.

Contrary to the State's contentions, the judge did not ignore this issue. The judge found it "most likely true [WOB] cannot find the franchise agreements in its records, but that does not necessarily mean the documents are illegitimate."  Because defendant retrieved the documents from his dated emails

and because WOB failed to produce the guaranty, which was in its possession, the judge found Novello's testimony not to be dispositive of the issue of authenticity. Rather, she determined "the jury should be given the opportunity to determine the evidence" that was presented during the hearing.

Defendant also produced the Tapmasters II principal owner's guaranty, which shows the interests split forty percent to Mingo and thirty percent each to defendant and Douglas. There is no dispute over the authenticity of this document. Although the guaranty is undated, it was attached to an email dated April 8, 2014 from Mingo to McCarthy, with a copy to defendant. The email reads in part, "Attached are the completed documents you've been looking for. . . . please send [defendant] the wire information so he can get the $30K over to you." Thus, notwithstanding the authenticity issues related to the Bhagu franchise agreements, the judge found this guaranty document standing alone was sufficient because it identified defendant as a thirty-percent owner.

We are also unconvinced by the State's argument the Tapmasters II guaranty is cumulative evidence. Our Supreme Court explained "'evidence [that] would shake the very foundation of the State's case and almost certainly alter the earlier jury verdict' could not be categorized as 'merely cumulative.'" Nash, 212 N.J. at 549 (alteration in original) (quoting Ways, 180 N.J. at 189).

Among the evidence defendant produced at trial was a May 7, 2014 text message to him from Mingo indicating the ownership percentage in New Jersey and Pennsylvania was forty/thirty/thirty, as defendant testified. We find no error with the judge's determination that the formal, signed document would likely change the verdict, given the State's theories of the case.

The State also contends the Tapmasters II guaranty is neither material nor relevant to defendant's ownership interest in WOB Hoboken because it indicated the ownership breakdown of the entire territory, which was all of New Jersey. We are unpersuaded by this argument because defendant was indicted for conduct occurring between March 18 and May 15, 2014, but the Hoboken Tapmasters LLC operating agreement, on which the State's case hinged, was not signed until May 2, 2014. Because the judge presided over the trial and observed the testimony and other evidence firsthand, she understood the purpose and import of the various agreements and was in the best position to determine whether the newly discovered documents would likely change the verdict.

In addition, the newly discovered documents concern not just whether defendant had the authority to accept investment funds in exchange for a thirty percent share, but whether he had the intent to deceive the investors when he solicited and obtained the funds. As the judge charged the jury, in order to prove

theft by deception, the State must prove a defendant purposely obtained the property by deception and must have known of the falsity: "If you find that the defendant believed in the accuracy or the impression created or reinforced, he's not guilty of deception even though that belief was unreasonable." Thus, contrary to the State's position, the newly discovered evidence need not show defendant actually had the authority to sell a thirty percent share. Rather, it is sufficient that the newly discovered evidence would impact the jury's decision whether he believed he had the authority to do so.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

18

A-2381-23